Good morning. May I please the court? I'd like to reserve one minute for rebuttal, please. This case is about the appellee's termination of my client's employment after seven years of service in violation of the Fair Employment and Housing Act, as well as common law, in addition to Labor Code section 1102.5 of the California Labor Code. By way of grant, a summary judgment made without oral arguments, the district court dismissed plaintiff's entire case against his former employees for harassing him, terminating him, based on discriminatory as well as retaliatory reasons. The evidence and the California law showed that the district court erred in doing so. Now, this is a employment civil rights case, and this court has consistently held that in an employment civil rights case, that very little evidence is necessary to survive summary judgment in such a case, because the ultimate question is one that can only be resolved through a searching inquiry, one that is most appropriately conducted by the fact finder upon a full record at time of trial to determine what the true motive was. We examined this case, the district court examined this case through the McDonnell-Douglas framework, and I'll speak to the retaliation claim first, then the discrimination claim, and then the harassment claim. With the retaliation claim, the district court found that there was a prima facie case, and the appellees do not dispute that. The district court then found that there was, the appellees had proffered non-discriminatory reasons for the termination of my client's employment. Appellant does not dispute that. The crux of this issue, at least as to the retaliation claims in violation of the Fair Employment and Housing Act, as well as California Labor Code 1102.5, is that the proffered reasons for my client's termination was pretextual. In support of the retaliation claim, whistleblower retaliation in violation of the section 1102.5 claim, there is direct evidence in the form of the declarations of not just my client, but the declarations of two current, at well as one former employee, all of whom describe my client as a hard worker, an excellent worker, some would describe him as. Counsel, that just doesn't go to the question of pretext. Right, and but they also... So where's the error in pretext? What was the pretext? What's your evidence that they engaged pretextually? They conducted an independent investigation. They talked to all of the witnesses. They went back, talked to a couple of people twice. Your client was spoken to twice. There's a written report as to all the reasons as to why they were going to terminate him. What was the pretext? And that's the offered proffered reason, but the pretext comes when my client made safety complaints throughout his employment, and especially in beginning in June 2013, where he would provide in writing the reasons why there are safety concerns, and why he either needs to be transferred out, or he needs to some kind of remediation. And the defend... the appellees do nothing to address these safety concerns. They don't separate him. They don't transfer him. They really don't do any kind of an investigation. Well, they did do an investigation, counsel. They went and talked to the outside contractors, who said this guy's been harassing them. One gal said, he's been stalking me, and she suggests, at least the way I that he was using the lack of... the fact that she wasn't wearing a hard hat is sort of the reason to go after her and stalk her. They talked to a number of people who said they were very uncomfortable, that he was out of control when he spoke with them, that he used bad language on occasion, and that although he may have been nominally complaining about safety concerns, always somebody not wearing a hard hat, that he was rude and inconsiderate to outside people. And first, my client disputes those allegations completely. He acknowledges that he had asked outside contractors to wear their... Right, but Tesoro has conducted an outside investigation. They brought somebody in here to do all of this. So where's the pretext? So, Your Honor, that was an investigation into allegations against him. But allegations, again, my client made against his supervisor, those were never investigated. That is the investigation that I was referring to, that the... You're talking about the letters that he wrote to... Yes, to the chairman of appellees, to the vice president, Daniel Carlson, to Kevin... And none of those... not one of those letters says that he's being discriminated on the basis of his race. And so I understand that, and that is why I'm starting with retaliation, Your Honor, that he made safety concerns, saying that there was a hostile work environment, that his safety concerns were not addressed when he raised... He doesn't complain of a hostile work environment. He... He doesn't like his supervisor. That's clear. And he actually writes very polite letters. He actually writes extremely well. I agree, Your Honor. And he makes these... So they're very articulate letters. He does not complain of race. He does not complain of a hostile work environment. He complains of safety concerns, and they're not being addressed. And that's why I'm saying that there's direct evidence that the people, his co-workers, the people who interact with Mr. Allen and with my client, Mr. Raphael, they see that his safety concerns have a negative impact on how appellees treat my client and how his supervisor... So is your theory of the case that this is not a case about race discrimination? Your Honor, there's different issues, and so... So for right now, on the retaliation, it's just retaliation because he's complaining of safety concerns. There's actually two separate causes of action. I'll move on to the FIHA claims, though, because the court, the district court, uses the same analysis for the Section 112.5 claims as well as the FIHA claims, and that my client, he made two separate charges of discrimination that he submitted to the EEOC, and then the EEOC then notified appellees about my client's discrimination charges. The first time was in September of 2013, and the defendants, the appellees were notified as of October 21st, 2013, of the claim of racial discrimination. Soon thereafter, he is suspended for cursing, for, excuse my language, but his version says, why do you give me the shit jobs, to Lauren Allen, the supervisor who he has complained consistently and in writing. Again, I don't see anything that he ever filed with anyone that says I'm being discriminated on the basis of my race. Except for, so there are EEOC charges of discrimination, and that's part of the record in September 2013. None of the letters, none of the interviews with the investigator prior to his termination did he complain about being discriminated on the basis of race. I have a couple of declarations from some of his co-workers and from the woman that he went with to one of the parties, so I've seen that, but I didn't see anything here where, and when he was asked in his deposition, I just didn't see the race claims. Well, Your Honor, he had a good faith basis to go to the EEOC and allege racial discrimination, so I understand that in the internal interviews, which he says were very curt, he did not explicitly say that he was being discriminated against on race, and as well as in his letters, he did not explicitly say that. I'm looking at his deposition. Did Mr. Allen ever say anything to you that was discriminatory based on your race? Not that I recall. Did he ever say anything to you that was discriminatory based on your national origin? Not that I recall. I understand that's what his deposition says, but he also submitted charges of discrimination to the EEOC, which the EEOC then notified. Was this deposition taken after he filed the EEOC charges or before? After, Your Honor. Okay. So the latest information, the latest evidence, when he was put under deposition after he I don't have any evidence. I don't – I'm not claiming race discrimination against Mr. Allen, my supervisor, or national origin discrimination. So what are we supposed to do here, counsel? Your Honor, it's not what he said. It's what appellees did. They terminated his employment and they suspended his employment. Right. For nonprotextual reasons. There's nothing about race in any of the reasons that they gave, and I'm trying to figure out where the refutation of that is. Where have you shown that it was protextual? Well, there's direct evidence of the race discrimination through the declarations of Robert Ritchie, as well as Ashrod Labate. And so this – Ms. Labate's declaration, of course, is years old. That's the holiday party. Yes, in December 2012, Your Honor. But just like in this case, just like this Court decided in Mays v. Winco, direct evidence of discrimination, even four years prior to the ultimate decision of termination, can be still used as direct evidence to find a protextual reason to at least submit this – these claims to finder of fact and not be disposed of at a summary judgment where there's limited information that can be provided. Do we have evidence that Mr. Allen was, in fact, the decision maker when it came to your client's termination? He was a participant in there, but – because he made the report. And in this – in the Dominguez-Curry case, the animus of a supervisor who affects the ultimate decision or even just influences it can be grounds to – Right. That's why I was asking, too. Do we have evidence that he, I guess in your words, that he influenced the decision? Yes, Your Honor. He was the one who took Mr. – my client, Mr. Rafael, to Human Resources who then suspended his – you know, his employment and then terminated it based on his word. But I thought the termination was conducted – it was – occurred after an independent investigation and was actually instituted by other folks higher up in the company. You say independent. It wasn't an outside. It was an internal by Ms. Fisher. Yes. That's fair. Right. And then Ms. Fisher – But independent of Mr. Allen, I guess, is what I was trying to convey. In other words, I understand what you're saying, that he's – maybe Mr. Allen got the ball rolling, but my understanding was that other folks then took over the responsibility for investigating whether the charges against your client had merit and then somebody else made the ultimate decision to terminate him based on that investigation. Well, he – Mr. Allen certainly participated and influenced the decision to terminate my client as he, as Your Honor said, got the ball rolling by making these allegations against my client, which he strenuously – But these are – but these are allegations that, as a supervisor, he's – in the ordinary course of his duties, he's got to make if he thinks that there's something wrong. Now, it may be that it's motivated by race, but that would be the – that's why HR would come in and investigate the whole thing. That's why they – that's why they interviewed everybody and concluded that it was not motivated by race, that it was motivated because of your client's bad behavior towards outside contractors and that there was a – there was a repeating pattern there that needed to be addressed. And Mr. Allen was not part of the ultimate decision to terminate him. Sure, there was a – there was a complaint by Mr. Allen about – about what he had done after they had a bad incident, but where's – where's Mr. Allen's role in termination other than doing what a supervisor would be expected to do? Well, he – he certainly participated by being interviewed and by being asked. He would have – he would have been subject to being terminated if he hadn't cooperated in the investigation. He being my client? No, Mr. Allen. Mr. Allen had to cooperate in the investigation. Isn't that who – isn't that who your – yeah, your client – your client cooperated. Again, he had to, just like Mr. Allen. But Mr. Allen was not involved in the decision to terminate him. Yes, that's correct. There's no evidence of that issue, but there – there doesn't need to be direct involvement. The supervisor, Mr. Allen, does not need to be the ultimate decision maker. The Dominguez versus – Dominguez-Curry case just requires influence or participation. Well, what's the – what's the influence or participation other than the fact that he had to cooperate in an internal investigation? Do you have evidence that he lied? That Mr. Allen lied? Yeah. Yes. And you have evidence of that? Yes, Your Honor. What's the evidence? The evidence is that my client states that he – he did not make the allegation – he did not make the – he did not say what he said. And also, the four people that were interviewed by Ms. Fisher couldn't corroborate what Mr. Allen said. And they were within a – a platform of – He wasn't just fired because of what he said to Mr. Allen. He was fired because of what he said to outside contractors. And my client, again – Did all – did all of them lie? Yes. When viewed – when viewing the evidence in favor of the plaintiff, the opposing party in a motion for summary judgment, my client says that did not happen, at least as to the way the aggressive approach that the outside contractors said that he – he did. And all of these contractors came about after he made his initial EEOC complaint. And so that is why one of the issues is I wanted to depose the person. But I thought you agreed that there was a legitimate basis for firing him, but only that it had – that it was pretextual. I thought that's how you started out. I – I started out that the district court found that there was at least non-discriminatory reasons proffered. I didn't say that they were correct or – I took it that you weren't addressing that. Okay. Right. And I was just focusing on the pretext of that, the last step in the McDonnell-Douglas framework.  Mr. Lee, we've taken you well over your time. Thank you, Your Honor. I will give you – I will give you a minute for rebuttal. Let's hear from Mr. Chamberlain. Thank you, Your Honor. Good morning, Your Honors. Michael Chamberlain for Pelley's Tesoro Corporation, Tesoro Refining Marketing Company. Maybe you could start with the race discrimination claims because the declarations from the co-workers are troubling in my view. They certainly suggest that Mr. Allen might have had some racist motivations for his interactions with the plaintiffs. So maybe you can address why that nonetheless summary judgment was properly granted to your And I think there are a couple of points on that. And the first is that, as Your Honor noted, one of those declarations was from 2012, which was more than two years before he was terminated. And the other one was for – Do you think that Mr. Allen's racist views kind of dissipated between 2012 and 2014? That's the argument? No. I don't think they're – I don't think that helps you much. So we have the two – I think two declarations in particular, maybe three. Maybe forget about the timing of them and just address why you think summary judgment was nonetheless properly granted. Fair enough. And to be clear, I do not think that Mr. Allen – there's been any evidence that Mr. Allen in fact held racist views. Let's talk about Astrid Labadee first. That was the one on the bus on the way to the Christmas party. That's the 2012. That's the 2012 Christmas party. Yeah. I think it's the one that Judge Watford said wasn't particularly interesting. Yes. And I think there are several reasons for that. First of all, Ms. Labadee does not say what he actually said. She says she heard him make – and she didn't say it was a racist remark. She says she heard him make a derogatory remark towards Mr. Raphael. Which she obviously interpreted as being – Which she concluded was racist, but without telling us what the remark was. Right. Ms. Labadee's conclusion as to what the meaning of that remark was doesn't tell us anything. What the judge found was that without evidence of what was actually said, we can't tell whether that was a racist remark or not. And her opinion, her unsupported opinion, doesn't constitute evidence of racial discrimination. I would also note that Mr. Raphael – Maybe not on its own, but it certainly is supportive of the plaintiff's allegation, right? That somebody who was sitting right there and heard the remark interpreted it to be based on race. Well, I would have two points on that. The first is that her opinion as to whether or not Mr. Olin – who, she didn't even know who Mr. Olin was at the time. And her opinion that Mr. Olin, based on this one remark, was a racist, I think is hardly dispositive of the issue in front of us. The other point I would raise is that Mr. Raphael – according to Ms. Labadee, Mr. Raphael was sitting right next to her on the bus when the statement was made. Mr. Raphael was asked, did you ever hear Mr. Olin make a racist statement toward you? And he said no. So Mr. Raphael didn't even think it was a racist statement based on his deposition testimony. With regard to Mr. Ritchie, Mr. Ritchie's comment is, frankly, fairly similar to Ms. Labadee's. It occurred sometime earlier. We don't know when. It's a little bit more concrete. And I grant you, he says it was prior to 2011, so it's even further back in time. But it's more concrete in terms of the nature of the remark being race-based, right? It is more concrete in that he at least says the remark was somehow based upon a bias against people from the Caribbean. Again, he doesn't say what the remark was. And his opinion that it was a bias remark against people from the Caribbean, again, I just don't think is substantial evidence when it's uncorroborated, when it's unsupported by any facts. But don't you think his subsequent statements in that same paragraph, which are quotes, don't you think those are connected to what he was saying? It's basically the intelligence level of Mr. Raphael. The subsequent statements in that paragraph, I think that he viewed it to be that Cyrus Raphael did not have a brain and was stupid, those comments? Yeah. Yeah. I actually think from the declaration, it's not at all clear that those were part of the same comment. He references one specific comment that was made on a specific occasion that he interpreted as being derogatories towards people from the Caribbean. The other statements that he references are essentially, and I think this is what the district court held as well, is that all they indicated is that Mr. Olin believed that Mr. Raphael was incompetent. And he may very well have believed he was incompetent. That doesn't mean he was racist about it. That's Mr. Olin's job as his supervisor is to evaluate his performance. If he believed that his performance was not up to snuff and that he couldn't give him the tasks that someone who was more competent he could give to, that doesn't mean he's racist. That simply means he's doing his job as a supervisor. Well, maybe, but I'm just looking again at that first sentence that basically on a daily basis, I mean, I'll just read it to you if you don't have it in front of you. It says, prior to 2011, in my presence, Lorne Olin made derogatory remarks about Caribbean people directed at Cyrus Raphael and on a daily basis said that he didn't have a brain, was stupid, and then left. Agreed. I think those are, from just parsing that declaration, it's two separate statements. He said he made a comment that he viewed as biased against Caribbean people. And then he says, and on a daily basis, he said that Mr. Raphael was stupid and didn't have a brain. Something along those lines. First of all, that was, again, four years before the termination, so if Mr. Olin held those beliefs, he certainly waited a long time to act on them. And second of all, that again, as a supervisor, his job is to evaluate the performance of Mr. Raphael. And those two comments, I don't believe, are linked in the declaration. There's certainly no reason to believe that they are, other than whoever drafted that declaration put them in the same paragraph. And this gentleman, I take it, was not deposed? This gentleman was not deposed. This declaration was submitted in opposition to the motion for summary judgment. He hadn't been identified prior to that. What about the evidence of Mr. Olin's involvement in the decision to terminate? Mr. Olin's involvement in that decision, even as Mr. Lee raises it, was solely the fact that he reported the comment that Mr. Raphael made to him on, I believe it was January 29th of 2015. And to be clear, he reported that comment to Human Resources. Mr. Raphael admitted making that exact comment that Mr. Olin reported. Mr. Raphael conceded that both in his deposition, in the investigation by Ms. Fisher, and in the summary judgment motion, he did not dispute the fact that he said those things. So exactly what Mr. Olin reported he said, he said. That was the sole involvement that Mr. Olin had in this termination. There is no evidence that Mr. Olin played any other role in the termination, other than reporting the comment, and then frankly cooperating in the investigation by being interviewed. Other folks within HR or above made the ultimate decision to terminate? That's correct. Ms. Fisher made the, Ms. Fisher conducted the investigation, made the recommendation, discussed it with management, and management decided in line with Ms. Fisher's recommendation that he should be terminated. And I would note, this was not the only incident we're talking about. There were prior incidents, again, that he's admitted he engaged in, that led up to this, and it's not all about Mr. Olin. There were three independent contractors from three separate companies who also reported that he was behaving aggressively and bullying and intimidating them. Three separate contractors from three separate companies separately reported this. This isn't all about Mr. Olin. Okay. Unless, I believe, frankly, those, I think you're focusing on the right things. I think those are the issues that are sort of key here. I think I've addressed those. If you have any other questions, I'd be happy to answer them. What about the issue of the safety complaints that your opposing counsel was addressing at the outset of his argument? Sure. First of all, the complaints that he made about Mr. Olin that he wrote to, I think, the CEO of the company and to various other people, those complaints were primarily that Mr. Olin was incompetent, that he was not a good supervisor, that he didn't run a good department. They were not directly related to safety. The primary safety complaints he made were the ones where he was, frankly, haranguing the contractors for not wearing helmets, not wearing hard hats. Those are the primary safety complaints he made. He hasn't pointed to any specific statute, as he would have to. 1102.5 only applies to those that— Oh, so you're making a legal response to that rather than a factual response, is that even if he did it, there's no statutory basis for that kind of retaliation? Yeah. Is that the idea? I'd say there's probably three responses to it. The first is he hasn't demonstrated pretext in the actual decision that was made for terminating him. For all the reasons we've been discussing all along, there was good reason to terminate him. He hasn't demonstrated that that was a pretext for anything. To the extent he made a complaint about safety— He was saying that the evidence of pretext is that there was hostility to him, or whatever you want to call it, retaliatory animus towards him for having made a fuss about stuff that he shouldn't have made a fuss about. That's what I took from his argument. I think that's a fair reading of what he said. I believe that his point was that he made a complaint itself, which somehow was evidence of pretext. I'd say that, at best, that's a protected act. I don't think he even did that, because I think the complaints that we saw were not about safety issues, about Mr. Allen being incompetent. Even if he had made a complaint, he would have to have a reasonable belief that it violates some law or statute. He hasn't alleged that. There's no evidence of that anywhere. Finally, I would say that the reasons that were given for his termination and the investigation that led up to that are very clear. He hasn't shown that those were a sham in any way. That's where you have to get to pretext. You'd have to show that the decision-makers were somehow influenced by the fact that he had made a safety complaint sometime before, and he hasn't shown that. Okay. Thank you. Thank you, counsel. Thank you. Mr. Lee, I'll give you a minute. Thank you, Your Honor. I'm from the Police Department. I just wanted to point out that this isn't, as Mr. Chamberlain said, not all about Mr. There are other decision-makers who were notified of the EEOC charge of discrimination, such as Doreen Bartels, who was part of the ultimate decision. So she clearly had knowledge of the protected activity, and she was involved in the termination decision. She was also... There's no evidence that she did racist things. Correct. And so that's why I'm focusing again on the retaliation claim, based on the charges of discrimination. But just knowing about complaints doesn't mean that you don't like people who make them. Correct, Your Honor. Do we have to sort of assume that? No, Your Honor. There is evidence in the fact that, as the head of Human Resources, she's the one who gets to tell people what to investigate, what issues to investigate. And as my point was before... And is there evidence that she told people to investigate people who made EEOC complaints? My point is that she refused to investigate my client's multiple complaints. That doesn't... Does that follow from that, that she had retaliatory animus towards him? That's my question. Yes, Your Honor. You could say maybe she incompetently or stubbornly didn't investigate his complaints, but how does that lead to an inference that there was retaliatory animus towards him? There's... You could just ignore stuff. I mean, a lot of people do. I'm not saying Ms. Bartels is incompetent, but what I am saying is that the... But you are suggesting that she was mad enough, or whatever the word for animus is, she was animated enough by that to do something that she shouldn't do, which is fire him for something else. That's correct, Your Honor. My point is... But how do we get that inference? Where do we get the inference that there's the animus, other than you just say there might be... The inference comes from the juxtaposition of how they treated my client, Mr. Rafael, when there's allegations that he cursed, versus his written complaints to multiple people. This is a comparable kind of argument? Is that what you're making? We're supposed to compare how they treated him versus how they treated the people he was complaining about? Is that the idea? Mr. Allin, that's correct, Your Honor. And that the handbook that the appellees have says that every single complaint will be duly and properly investigated, something to that effect. Appellees never even talked to Mr. Allin. Mr. Allin, at his deposition, said he had no idea that my client had any problems with him, that my client felt that he had been harassed, discriminated against, or retaliated against. It was clear that appellees never even... Are they similarly situated, though? I mean, one is above the other, right? One is higher? Correct. If you're going to make that kind of argument, you have to... You have these doctrines that the people have to be similarly situated in order to be comparable. Right? Yeah. They're similarly situated in the nature of the complaints. My client complained that he had been singled out, he had been bullied and treated rudely by Mr. Allin. Appellees never even investigated him, never even took the first step of talking to him about those complaints, versus my client, he was telling people to wear their hard hat in places that he believed it was necessary for their safety, and they terminated his employment for those. I got you. Thank you. Thank you. Thank you, Your Honor. Thank you, Mr. Lee. Thank both counsel for the argument. Raphael v. Tesoro is submitted.
judges: Rogers, Bybee, Watford